**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MIKAL HASHIM ELLIS** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | **NO. 17-5093** |
| **NANCY A. BERRYHILL** | : | |

**MEMORANDUM**

**KEARNEY, J.**                                                          **November 30, 2018**

Mikal Hashim Ellis asks we review the Social Security Commissioner's denial of benefits. An Administrative Law Judge of the Social Security Administration evaluated and weighed evidence and denied Mr. Ellis's appeal of the Commissioner's ruling. After the Appeals Council also denied his appeal, Mr. Ellis properly sought our review of Administrative Law Judge's decision. Mr. Ellis argues the Administrative Law Judge erred in multiple ways including denying him due process and making findings not supported by substantial evidence. The Commissioner disagrees. While do not find a denial of due process and find substantial evidence for some of the holdings, after careful study of the variety of arguments raised in extensive briefing, the Administrative Law Judge erred in certain other findings lacking substantial evidence requiring remand and further consideration. We partially grant Mr. Ellis's petition for review and remand to the Commissioner consistent with this Memorandum in the accompanying Order.

## I.     Background

Mikal Hashim Ellis asks we reverse or remand the Social Security Administration Commissioner's October 2016 decision denying his request for supplemental security income benefits. Mr. Ellis, 41 years old at the time he filed his request for benefits in 2013, suffered from back and right knee pain, as well as anxiety and depression. Mr. Ellis injured his back in a motor

vehicle accident in 2002, and later injured his knee. Mr. Ellis has not worked since 2007, when he served for a short time as a barber following his release from prison. The Social Security Administration denied Mr. Ellis's claim at the initial level of review, and he requested a hearing before an Administrative Law Judge (ALJ).[1] ALJ Christine McCafferty granted Mr. Ellis various continuances so he could obtain counsel. Mr. Ellis appeared with counsel for his August 3, 2016 merits hearing.[2]

### A. Mr. Ellis's testimony before Administrative Law Judge McCafferty.

Mr. Ellis testified he has not worked since 2007. He suffers from back spasms and pain stemming from a 2002 motor vehicle accident.[3] Mr. Ellis, twice imprisoned, testified his last prison term spanned 2002 through 2007.[4] Mr. Ellis received "[v]ery little" mental and physical treatment while incarcerated.[5] Mr. Ellis worked as a licensed barber after his release in 2007.[6] He lasted "[n]o more than three [or] four months" on the job, however, because he physically "just couldn't do it anymore."[7] The job required "a lot of twisting, turning," and as the person in charge of closing the shop, he had to "pull down . . . a heavy gate."[8] Mr. Ellis testified to be a good barber "you can't sit down on the job," and it "really put [him] in a lot of pain."[9] Mr. Ellis did not renew his barber's license, nor has he worked anywhere since 2007.[10]

Mr. Ellis testified in detail about the pain his back spasms cause.[11] "If I stand for a long period of time, I'm in pain."[12] He also experiences "excruciating pain" if he "sit[s] down for a long period of time."[13] Mr. Ellis stood up numerous times during the hearing.[14] He testified "[t]here are times when I'm in so much pain that I have to lay on the sidewalk to relieve the spasms that I'm having, and I'm embarrassed to do it, but I have to in order to—for the pain to subside."[15] Mr. Ellis estimated four times in the prior month he had to lie down in public "or just stop and sit

down . . . until the spasms subside[d]."[16]  The pain, he said, "goes away and it comes back all day."[17]  The pain significantly impairs his mobility.  Mr. Ellis testified, for example, he:

> didn't even wear shoes today because I have a hard time putting on my shoes and putting on my socks. . . . I have on flip flops with no socks.  Am I embarrassed? Yes, but . . . I'm in so much pain that I can't do the things that I once could do.[18]

He described how his morning consists mostly of waiting for his pain medication to take effect:

> I don't — I don't just get up in the morning time.  I have to roll out of bed.  I have to physically roll out of bed to take my medication in the morning time.  That's the first thing that I look for because in the morning time, there have been times when I've been brought to tears because of — because of my pain, and I sit up.  I reach for my medication.  I take my prescribed medication.  And then I lay back down until the medication starts to — starts to work.  Once that starts to work, I roll myself up out of bed, prop myself up, and grab my cane.  I have to walk to the bathroom to relieve myself, and I have — if I have to defecate, there are times when I just can't even — it's just I'm in so much pain, I can't even wipe myself.[19]

Mr. Ellis spends his days going to appointments and watching television shows.[20]  He mostly channel surfs because he "[c]an't concentrate."[21]  "My pain is a distraction for me to concentrate on anything," he testified.[22]  "I feel like pins and needles are running down my legs."[23]  Mr. Ellis maintains some knowledge of current events by occasionally reading the newspaper if his daughters or mother brings it to him.[24]  His routine does not vary on the weekends, as he does not have a social life.[25]  His family sometimes visits him to keep him company and cook for him.[26]  Mr. Ellis does not cook for himself; he relies instead on microwaveable meals, sometimes prepared by family members.[27]  Mr. Ellis does not have any hobbies.[28]  He used to love sports but is not able to play them anymore.[29]  "[T]he only thing that I look forward to, and makes me feel better temporarily is going to the gym and working with the therapist in the pool and doing exercises that help me help my back spasms and my — and my knee that I had surgery on."[30]

**B.      Vocational Expert Kristal-Turetzky testifies at the hearing.**

Vocational Expert Sherry Kristal-Turetzky testified at the merits hearing.[31]    ALJ

McCafferty posed the following hypothetical to Vocational Expert Kristal-Turetzky:

> Q.      I want you to assume an individual of the claimant's age, education and work
> experience having the following residual functional capacity.  Being able to lift up
> to 20 pounds.  Sit for six hours, stand and walk for two hours, with an at will
> sit/stand option, occasional postural activities, no pushing or pulling with the lower
> extremities.  No overhead reaching.  Being limited to simple, repetitive tasks with
> only occasional changes in the work setting, and occasional contact with the public
> and coworkers.  Could that individual return to claimant's past work?
>
> A.      No, Your Honor.[32]

ALJ McCafferty asked Vocational Expert Kristal-Turetzky whether other jobs in the

regional or national economy exist for an individual with Mr. Ellis's limitations.[33]  Vocational

Expert Kristal-Turetzky identified three: bench assembler, compact assembler, and garment

sorter.[34]

Mr. Ellis's counsel inquired, "sit/stand option and overhead reaching, these things are

not covered by the [*Dictionary of Occupational Titles*], correct?"[35]  Vocational Expert Kristal-

Turetzky responded counsel is correct, but added her opinion the jobs are consistent with the

Judge's hypothetical is "based on professional experience and performing on-site job analyses,

labor market research . . . and job placement."[36]  Counsel also asked Vocational Expert Kristal-

Turetzky to identify entities employing individuals with the limitations identified by Judge

McCafferty.[37]  When Vocational Expert Kristal-Turetzky said she could not recall the name or

address of the employers, counsel informed Judge McCafferty he intended "to provide

interrogatories to the employer to see if these are accommodations . . . that are tolerated."[38]  Judge

McCafferty required counsel first submit the interrogatories so ALJ McCafferty could decide whether to approve or disapprove them.[39]

### B. Mr. Ellis's counsel submits post-hearing interrogatories to Vocational Expert Kristal-Turetzky.

Mr. Ellis's counsel submitted post-hearing interrogatories to Vocational Expert Kristal-Turetzky.[40] Mr. Ellis's counsel requested the following information for each worksite where Vocational Expert Kristal-Turetzky observed the occupations of bench assembler, compact assembler, and garment sorter "being performed with a sit/stand option and the accommodation of never having to reach overhead":

> (a) [e]mployer name; (b) [m]ailing address; (c) [p]hysical address of the worksite; (d) [n]ame and contact information of personnel aware of the requested information; (e) [t]he number of times that you have observed an employee(s) with these accommodations at the particular worksite; and (f) [e]rosion of the occupational base for this occupation caused by the limitations of sit/stand option and the accommodation of never having to reach overhead.[41]

In interrogatory four, Mr. Ellis's counsel requested the same detailed information "[s]hould you provide any alternative occupation(s) in response to the ALJ's hypothetical questions at the hearing held on August 3, 2016."[42] In bolded font on the cover letter to the interrogatories, Mr. Ellis's counsel notified Judge McCafferty, "[b]ased on the VE's responses to these interrogatories, we request the opportunity to submit interrogatories to the subjects of the VE's interrogatory responses, or have this court subpoena a representative of said company to come and testify in order to corroborate the VE's testimony."[43]

In response, Vocational Expert Kristal-Turetzky first "decline[d] to provide specific employer contact information," explaining the request "threatens both my ability, and that of my colleagues[,] to perform our jobs if any employer we contact, or have contacted, will potentially or subsequently be served with legal notice to respond to interrogatories about the nature of their

work or to be subpoenaed in regard to an individual who does not work for them.[44]  Vocational Expert Kristal-Turetzky then proceeded to respond to the interrogatories based on her professional experience since 1988.  Regarding the job of bench assembler, Vocational Expert Kristal-Turetzky responded "there are many bench assembly jobs performed at a workstation that allows for an individual to sit or stand while performing their job tasks."[45]  "The very nature of the work typically does **not** require overhead reach" and "[t]hus, if overhead reach is not required to perform the job tasks then this is not an 'accomodation.'"[46]  Vocational Expert Kristal-Turetzky estimated "the erosion of the occupational base for the sit-stand option is 50%."[47]

Regarding the job of compact assembler, Vocational Expert Kristal-Turetzky explained "this work has been performed at table height moving along a very slow moving conveyor belt," with "seats for all who perform the work."[48]  Compact assemblers, Vocational Expert Kristal-Turetzky explained, "are allowed to sit and stand as needed while continuing to perform their designated job task[]," which "does **not** require overhead reach."[49]  Vocational Expert Kristal-Turetzky estimated "the majority of unskilled sedentary jobs allow for a sit-stand option with minimum erosion of the occupational base of no more than 10%."[50]

And finally, Vocational Expert Kristal-Turetzky withdrew her statement at the merits hearing Mr. Ellis could serve as a garment sorter.  "This job title," Vocational Expert Kristal-Turetzky clarified, "was offered in **error** as Garmet Sorter does not allow a sit-stand option and it may require overhead reach to perform the job duties."[51]

Mr. Ellis's counsel filed a supplemental post-hearing brief and objections to Vocational Expert Kristal-Turetzky's testimony.[52]  Mr. Ellis's counsel emphasized Vocational Expert Kristal-Turetzky's "responses to the claimant's interrogatories were nothing more than unfounded, uncorroborated speculation as to what an employer may or may not require and contrary to Social

Security policy."[53]   Counsel added "[w]ithout being afforded an opportunity to rebut this testimony, the use of the VE's testimony in denying the claimant's disability benefits would be inappropriate."[54]

ALJ McCafferty responded to Mr. Ellis's brief by notifying him he could take various actions:

> You may submit any or all of the following: written comments concerning the evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician).  You may also submit written questions to be sent to the author(s) of the new evidence.
>
> You may also request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law.  If you request a supplemental hearing, I will grant the request unless I receive additional records that support a fully favorable decision.  In addition, you may request an opportunity to question witnesses, including the author(s) of the new evidence.  I will grant a request to question a witness if I determine that questioning the witness is needed to inquire fully into the issues.  If an individual declines a request by me to appear voluntarily for questioning, I will consider whether to issue a subpoena to require his or her appearance.[55]

The extensive record does not reveal counsel took further action in response to ALJ McCafferty's notice.

### C.    The Commissioner reviewed Mr. Ellis's disability claims under the established five-step sequential analysis.

A claimant has a "disability" is he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."[56]  To effectuate Congress's intent to provide disabled individuals' supplemental security income, the Commissioner must follow a five-step analysis to determine whether a claimant has a disability as defined under federal law.[57]  The Commissioner at step one

determines "whether the claimant is engaged in substantial gainful activity."[58]  Engagement in such activity precludes an award of benefits.  If, however, the claimant is not engaged in substantial gainful activity, the Commissioner moves to step two and evaluates the "severity of the claimant's impairment(s)."[59]  A claimant's failure to show his or her impairments are "severe" precludes an aware of benefits.[60]  If the claimant proves his or her impairments are severe, the Commissioner proceeds to step three and "determines whether the impairment is equivalent to one of a number of listed impairments that . . . are so severe as to preclude substantial gainful activity."[61]  If the Commissioner determines "the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled."[62]

 If, on the other hand, "the applicant has a severe impairment that does not meet or equal an impairment in the Listings, the ALJ must determine at step four whether the applicant has the Residual Functioning Capacity ("RFC") to perform her former relevant work."[63]  "[R]esidual functional capacity" is simply "the bureaucratic term for ability to work."[64]  If the claimant satisfies step 4 and shows he or she does not have the ability to perform former relevant work, "the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform."[65]  "[I]f the Commissioner cannot demonstrate that the applicant has the [residual functional capacity] to perform other existing work[,] the ALJ must find the applicant to be disabled."[66]

### C.    ALJ McCafferty concludes Mr. Ellis is not disabled.

In a decision dated October 3, 2016, ALJ McCafferty denied Mr. Ellis's request for supplemental security income.[67]  ALJ McCafferty concluded at step one Mr. Ellis "has not engaged in substantial gainful activity since December 16, 2013, the application date."[68]  Turning to step two, ALJ McCafferty found Mr. Ellis has the following "severe impairments": (1) degenerative

disc disease, (2) osteoarthritis, (3) depression, and (4) anxiety.[69]  At step three, ALJ McCafferty concluded although Mr. Ellis's impairments are "severe," none "meets or medically equals the severity" of a listed impairment.[70]

At step four, ALJ McCafferty found while Mr. Ellis's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," Mr. Ellis's "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record."[71]  ALJ McCafferty found Mr. Ellis has the residual functional capacity to perform light work[72] subject to the following limitations:

> except lift up to 20 pounds; sit for six hours and stand and/or walk for two hours in an eight-hour workday; occasional performance of postural activities; no pushing or pulling with lower extremities; and no overhead reaching.  The claimant is limited to simple, repetitive tasks with only occasional changes in the work setting and occasional contact with the public and coworkers.[73]

ALJ McCafferty found "the evidence does not establish that [Mr. Ellis's] use of a cane is medically necessary or that he experiences pain 24/7."[74]  ALJ McCafferty found relevant the fact Mr. Ellis "has not consistently participated in physical therapy and has not required any surgical procedures for his back impairment."[75]  ALJ McCafferty found Mr. Ellis "can ambulate effectively without a medically required hand-held assistive device," and, "[a]s to his mental impairments, the claimant did not seek treatment until November 2015 and has not required any psychiatric hospitalization or intensive outpatient treatment."[76]

ALJ McCafferty afforded little weight to the medical opinions of Daniel P. Coachi, M.D., Jiwesh Jha, M.D., John J. Bowden, Jr., D.O., P.C., as well as state agency physician Kathleen Mullin, M.D.  Mr. Ellis filed a request for review, which the Appeals Council denied.[77]

## II.   Analysis

"The Appeals Council's denial of Plaintiff's request for review means the ALJ's decision is the decision of the Commissioner."[78]  We review ALJ McCafferty's October 3, 2016 written decision.[79]  We review ALJ McCafferty's interpretation and application of the law de novo, but we review ALJ McCafferty's factual findings under the deferential substantial evidence standard.[80]  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[81]  Substantial evidence "is more than a mere scintilla," though the standard "requires less than a preponderance of the evidence."[82]  Substantial evidence review means we "may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record."[83]  It is therefore irrelevant whether "acting de novo, [we] would have decided the case differently."[84]

A.    **ALJ McCafferty failed to resolve a conflict between Vocational Expert Kristal-Turetzky's testimony and the *Dictionary of Occupational Titles*.**

Mr. Ellis first challenges the ALJ's decision at step five concluding "there are jobs that exist in significant numbers in the national economy that [Mr. Ellis] can perform,"[85] specifically those of Compact Assembler and Bench Assembler.[86]  Mr. Ellis argues the ALJ reached this conclusion based solely on Vocational Expert Kristal-Turetzky's testimony, but before doing so failed to resolve a conflict between Vocational Expert Kristal-Turetzky's statement Mr. Ellis could not follow detailed instructions and the reasoning level—found in the *Dictionary of Occupational Titles*—requiring Mr. Ellis be able to follow detailed instructions.   We find Mr. Ellis's position well-grounded in authority from our Court remanding under similar circumstances.

To determine at step five whether there exist jobs in significant numbers in the national economy the claimant could perform, "'the ALJ often seeks advisory testimony from a vocational expert.'"[87]  Such testimony "typically includes, and often centers upon, one or more hypothetical

questions posed by the ALJ to the vocational expert," in which [t]he ALJ will normally ask the expert whether, given certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy."[88]   The ALJ additionally "consult[s] the *Dictionary of Occupational Titles* ('DOT'), a publication of the United States Department of Labor." [89]   The *Dictionary of Occupational Titles* "lists and defines all jobs available in the national economy and specifies what qualifications are needed to perform each job."[90]   Each listing contains a breakdown of "the requirements necessary to perform a job."[91]

At issue here are the *Dictionary of Occupational Titles'* reasoning levels, which "refer to informal and formal levels of education required for satisfactory job performance."[92]   "A job with a reasoning level of 1 requires skills to '[a]pply commonsense understanding to carry out simple one-or two-step instructions'" and "'[d]eal with standardized situations with occasional or no variables in or from these situations encountered on the job.'"[93]   "[A] job with reasoning level 2 is defined as the 'ability to apply common sense and understanding, to carry out detailed but uninvolved written or oral instructions and deal with problems involving a few concrete variables in or from standardized situations.'"[94]

Mr. Ellis is "limited to *simple, repetitive tasks* with only occasional changes in the work setting."[95]   Mapped onto the *Dictionary of Occupational Titles* reasoning levels defined above, Mr. Ellis appears to fall squarely within a reasoning level of 1, which requires skills sufficient to "carry out *simple* one-or two-step instructions" and "deal with *standardized situations*."   But Vocational Expert Kristal-Turetzky testified Mr. Ellis could perform the jobs of compact assembler and bench assembler, each of which require a reasoning level of two.   And a reasoning level of two requires the ability to carry out "*detailed* but uninvolved written or oral instructions."[96]

Mr. Ellis's counsel explored this conflict at the merits hearing, asking Vocation Expert Kristal-Turetzky, "[W]ould it be correct to say that the Judge's limitation to simple, routine work would preclude the ability to carry out detailed instructions[?]"[97] Vocational Expert Kristal-Turetzky replied, "Correct."[98]

The Commissioner cites *Money v. Barnhart*, in which our Court of Appeals rejected the claimant's argument the vocational expert's identification of level two reasoning jobs does not comply with the ALJ's determination she be limited to "simple, routine and repetitive" work.[99] The Commissioner emphasizes our Court of Appeals' finding that "[w]orking at a reasoning level two would not contradict the mandate that [the claimant's] work be simple, routine, and repetitive."[100] Level two, our Court of Appeals held, "only requires a person to "apply commonsense understanding to *carry out detailed but uninvolved written or oral instructions*[, and] deal with problems involving a few concrete variables in or from standardized situations.""[101] But as the last sentence makes clear, no expert testified the claimant could not carry out detailed instructions.

Our case is more analogous to *Alvarado v. Colvin*,[102] in which Judge Caracappa considered the fact, not present in *Money*, of a Vocational Expert's testimony the claimant could not carry out detailed instructions. The ALJ in *Alvarado* described the claimant as limited to "routine, repetitive tasks." But "[a]ll of the jobs identified by the vocational expert required a reasoning level of 2," which, as we defined above, requires the ability "to carry out detailed but uninvolved written or oral instruction."[103] Plaintiff's counsel in *Alvarado* "asked the vocational expert if the restriction to routine, repetitive tasks, would preclude plaintiff from being able to carry out detailed instructions," and "[t]he vocational expert testified that yes, a restriction to routine, repetitive tasks, would preclude plaintiff from being able to carry out detailed instructions."[104] Judge Caracappa

found a clear conflict in the vocational expert's testimony. The ALJ's failure to "ask the vocational expert to clarify these inconsistencies" required remand "so that the ALJ can explain these inconsistencies."[105]

The similarity between Judge McCafferty's hypothetical and Vocational Expert Kristal-Turetzky's response, and the nearly identical testimony at issue in *Alvarado* warrants further evaluation. Both jobs identified by Vocational Expert Kristal-Turetzky require a reasoning level of two. And Mr. Ellis's limitation "to simple, repetitive tasks with only occasional changes in the work setting,"[106] when considered in conjunction with Vocational Expert Kristal-Turetzky's testimony he cannot carry out detailed instructions, appears to collide with reasoning level two's requirement he be able to carry out "detailed" instructions.[107] We cannot conclude harmless error here as Vocational Expert Kristal-Turetzky's testimony formed the basis of ALJ's McCafferty's decision at step five.

We remand this issue to the Commissioner for evaluation and possible further explanation of this apparent conflict.[108]

F.     **The ALJ did not deprive Mr. Ellis of due process by relying on the Vocational Expert's testimony based on years of professional experience.**

Mr. Ellis argues we must remand because the ALJ violated his due process rights in relying on Vocational Expert Kristal-Turetzky's testimony after Vocational Expert Kristal-Turetzky refused to provide the names and contact information of employers Mr. Ellis requested in his interrogatories.[109] The Commissioner counters a Vocational Expert need not provide a separate foundation for his or her testimony, and the ALJ here properly considered Vocational Expert Kristal-Turetzky's testimony, which she expressly based on her personal observations and professional experience.[110]

Mr. Ellis's due process challenge is not meritorious under these circumstances. While a claimant maintains the due process rights to cross-examine witnesses and present rebuttal evidence, this record demonstrates ALJ McCafferty provided Mr. Ellis ample opportunities to contest Vocational Expert Kristal-Turetzky's testimony as to the availability of compact assembler and bench assembler jobs in the economy containing a sit/stand option and requiring no overhead reaching.

ALJ McCafferty permitted Mr. Ellis to submit post-hearing interrogatories to Vocational Expert Kristal-Turetzky. Mr. Ellis then submitted a post-hearing brief and objections to Vocational Expert Kristal-Turetzky's responses, after which ALJ McCafferty informed Mr. Ellis of his rights to submit, among other things, "written comments concerning the evidence, a written statement as to the facts and law you believe apply to the case in light of that evidence, and any additional records you wish me to consider (including a report from the treating physician)," as well as his right to "request a supplemental hearing at which you would have the opportunity to appear, testify, produce witnesses, and submit additional evidence and written or oral statements concerning the facts and law."[111] Mr. Ellis does not point to any further action he took in response to this invitation.

Mr. Ellis instead appears to challenge only the evidentiary weight ALJ McCafferty placed on Vocational Expert Kristal-Turetzky's interrogatory responses. It might be a different question if Vocational Expert Kristal-Turetzky declined to answer the interrogatories altogether. But such is not the case here. We do not fault the ALJ for declining to extract by compulsion an answer from the Vocational Expert which she did not wish to give. We will not shoehorn an evidentiary challenge into the category of "due process" under these circumstances.

Nor does Mr. Ellis provide authority requiring us to do so. Mr. Ellis cites *Townley v. Heckler*, for example, in which the United States Court of Appeals for the Second Circuit remanded after finding the ALJ's use of post-hearing evidence without providing the claimant an opportunity to cross-examine and present rebuttal evidence violated the claimant's due process rights.[112] But while *Townley* amply exemplifies a procedural due process violation, the case is not materially similar to our events. In *Townley*, the ALJ enlisted the assistance of a vocational expert after the merits hearing, even though the ALJ neither testified nor appeared at the merits hearing. The ALJ instead submitted written interrogatories to the vocational expert after the hearing, but did not notify the claimant's counsel of the vocational expert's involvement until after the ALJ already received the Vocational Expert's report.[113] The ALJ asked the claimant's counsel "to submit additions or objections to the interrogatories posed to the expert," without notifying counsel "he had already received the expert's response."[114] Claimant's counsel "requested that he be permitted to cross-examine the expert at a hearing," but the "ALJ replied that the expert could not attend a hearing for several months, invited further questions, and stated his intention to decide the case on the record."[115]

The court of appeals held the ALJ denied the claimant "his due process rights to cross-examine the expert and to present rebuttal evidence."[116] The court of appeals explained claimant's counsel "was not informed of the need for expert vocational evidence until after the report was filed with the ALJ," "appellant was denied an opportunity to examine that vocational report, and, despite claimant's request, no additional hearing was held."[117] The court of appeals also found relevant "[a]lthough the ALJ asked appellant's attorney to submit objections and additions to the interrogatories posed to the vocational expert, there is no evidence that the attorney's suggestions were ever forwarded."[118]

Unlike the ALJ in *Townley*, ALJ McCafferty provided Mr. Ellis ample opportunity to undermine Vocational Expert Kristal-Turetzky's testimony with his own evidence. Mr. Ellis apparently declined the opportunity—seeking instead to argue the ALJ must ignore all of vocational expert Kristal-Turetzky's testimony—instead of presenting contrary evidence of his own.

The United States Court of Appeals for the Seventh Circuit imposes the very sort of evidentiary burden upon the ALJ Mr. Ellis urges we apply here. Our Court of Appeals has cautioned against endorsing it. As our Court of Appeals explains, "the Seventh Circuit [has] held that if the basis for a vocational expert's conclusions is questioned, 'the ALJ should make an inquiry (similar though not necessarily identical to that of [Federal Rule of Evidence] 702) to find out whether the purported expert's conclusions are reliable.'"[119] Our Court of Appeals said, with heightened skepticism, "[w]e have not adopted it, nor has any court outside the Seventh Circuit."[120]

In *Welsh v. Commissioner*, the same case in which our Court of Appeals expressed those sentiments, our Court of Appeals found no reversible error where the ALJ accepted "without further probing, the vocational expert's testimony regarding the nature and availability" of certain jobs, where counsel "had the opportunity to challenge the vocational expert's methodology and status as an expert, or to offer conflicting testimony regarding specific job numbers available in the region," but "simply failed to do so."[121] Our Court of Appeals, as Judge Mariani recently explained, "has largely departed" from the contrary view of the United States Court of Appeals for the Seventh Circuit, which requires the ALJ to inquire into the reliability of the vocational expert's conclusions when challenged.[122] We find ALJ McCafferty ensured Mr. Ellis had ample opportunity to present favorable evidence and test the strength of evidence and testimony potentially undermining his claim. We therefore deny Mr. Ellis's request for review of this issue.

### E. We require further explanation as to whether Mr. Ellis's back and knee impairments medically equal the severity of a listed impairment.

Mr. Ellis next argues the ALJ erred at step three in failing to analyze "whether Mr. Ellis'[s] back condition and right knee impairments were equivalent or 'equal to' the severity of a listed impairment."[123] We agree further analysis is required.

"[T]he claimant is conclusively presumed to be disabled" if the Commissioner determines the claimant's impairment "meets or equals one of the listed impairments."[124] "If the claimant's specific impairment is not a Listed Impairment, the ALJ must consider whether the claimant's impairment or combination of impairments is 'medically equivalent' to a Listed Impairment."[125] For purposes of this analysis, "medically equivalent" means the impairment "is 'at least equal in severity and duration to the criteria of any [L]isted [I]mpairment.'"[126] Mr. Ellis argues the ALJ assessed whether Mr. Ellis's back and knee impairments "met" Listing 1.02 and Listing 1.04 but failed entirely to consider whether Mr. Ellis medically equaled those listed impairments.[127]

Regarding Mr. Ellis's back and knee impairments, ALJ McCafferty found:

Although the claimant has "severe" impairments, they do not meet the criteria of any listed impairments described in Appendix 1 of the Regulations (20 CFR, Subpart P, Appendix 1). No treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment of the Listing of Impairments.

Listing 1.02 is not met because there is no evidence of inability to ambulate effectively as defined in section 1.00(B)(2)(b) and required by section 1.02A or involvement of one major peripheral joint in each upper extremity resulting in inability to perform fine and gross movements effectively as defined in section 1.00(B)(2)(c) and required by section 1.02B. Listing 1.04 is not met because the record does not demonstrate compromise of a nerve root or the spinal cord with additional findings of: evidence of nerve root compression characterized by neuroanatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss with positive straight leg raises, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication.[128]

In the next sentence, ALJ McCafferty found: "The evidence to support the above findings is discussed in further detail below."[129] The remaining portion of ALJ McCafferty's analysis at step three, however, discusses only Mr. Ellis's mental impairments.[130] The Commissioner argues we must read the ALJ's decision as a whole. It is true an ALJ need not "use particular language or adhere to a particular format in conducting his analysis."[131] But the ALJ must also provide sufficient explanation to permit meaningful judicial review.

ALJ McCafferty did not consider or discuss evidence potentially showing Mr. Ellis's back and knee impairments medically equaled the severity of a listed impairment. For example, while a "positive straight leg raising test and other diagnostic tests" may "suggest[] nerve root impairment,"[132] ALJ McCafferty did not assess whether Mr. Ellis's positive straight leg tests and other positive tests sufficed to medically equal Listing 1.04. Nor did ALJ McCafferty assess whether Mr. Ellis's complaints of subjective pain and mobility limitations, well documented in Dr. Bowden's treatment notes, impair his ability to ambulate effectively for purposes of Listing 1.02.

We remand so the Commissioner may evaluate and provide "[t]he evidence to support the above findings" missing from this section of the analysis.[133]

**F.  We defer to ALJ McCafferty's determination Mr. Ellis retained the residual functional capacity to do "light work," subject to additional limitations.**

Mr. Ellis next argues ALJ McCafferty erred as a matter of law in concluding Mr. Ellis could engage in "light work," despite also finding he could "sit for six hours and stand and/or walk for two hours in an eight-hour workday."[134] Mr. Ellis argues his restrictions correspond as a matter of law with a finding of sedentary work, not light work, and ALJ McCafferty's residual functional

capacity determination therefore rests on an error of law. We defer to ALJ McCafferty's finding on this issue.

"In making disability determinations, the Social Security Administration looks to see whether a claimant can perform the physical exertion requirements of either his past relevant work or jobs that exist in significant numbers in the economy."[135] The physical exertion requirements are classified as "sedentary, light, medium, heavy, or very heavy work."[136] We are reviewing the sedentary and light classifications. The Commissioner defines "[s]edentary work" as work "involv[ing] lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."[137] Though a sedentary job "involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties."[138] In sedentary jobs, "walking and standing are required *occasionally*."[139] The Commissioner clarifies "[s]ince being on one's feet is required 'occasionally' at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday."[140]

The Commissioner defines "light work," by contrast, as work involving "a good deal of walking or standing."[141] Light work "involves lifting no more than 20 pounds at a time with *frequent lifting or carrying* of objects weighing up to 10 pounds."[142] The Commissioner further clarifies "[s]ince frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."[143] Unlike with sedentary jobs, the Commissioner explains, sitting during light work jobs "may occur intermittently during the remaining time."[144]

"In 1978, to improve both the uniformity and efficiency of this determination, the Secretary promulgated, through an administrative rulemaking, medical-vocational guidelines, or 'grids,' that

establish the types and number of jobs that exist in the national economy for claimants with exertional impairments."[145] "The grids are divided into five residual function categories based on the definitions set forth in 20 C.F.R. § 404.1567," and "[e]ach residual function category is subdivided by age, education, and work experience."[146] The Commissioner can use the grids to "determine whether a claimant is disabled under the grids by matching the claimant's age, education, and work experience with his [residual functional capacity]," but "[t]he grids may not be applied conclusively where the claimant does not fall squarely within all of the criteria of a specific rule, i.e., because his or her exertional limitations prevent the performance of the full range of work within a regulatory [residual functional capacity] category or because a claimant does not fit sparely within a particular vocational classification."[147] ALJ McCafferty made the reasoned decision Mr. Ellis falls somewhere between the sedentary and light work categories.

Mr. Ellis cites *Campbell v. Astrue*,[148] in which Judge Strawbridge remanded after finding the ALJ's residual functional capacity determination, described as a narrowed range of light work, inherently contradicted the ALJ's finding the claimant could stand or work no more than one to two hours per work day.[149] Judge Strawbridge found the ALJ's residual functional capacity determination "problematic in two senses."[150] "First," Judge Strawbridge found, "the ALJ's characterization of Plaintiff's exertional capabilities as within the range of 'light work' is incongruent with the ALJ's particularized finding that Campbell is limited with respect to standing and walking."[151] Judge Strawbridge emphasized the Commissioner's explanation in SSR 83-10 clarifying "a job is in the 'light' category 'when it requires a good deal of walking or standing,' and this is 'the primary difference between sedentary and most light jobs,' with the exception of sitting jobs requiring pushing or pulling of arm or leg controls and not applicable here."[152] Second, Judge Strawbridge found "an inherent contradiction between the ALJ's finding that Campbell

could 'frequently' lift or carry 10 lbs.—which, pursuant to SSR 83–10, would require Campbell to be on his feet for between approximately 3 to 6 hours of an 8–hour workday—and his finding that Campbell had the capacity to perform work requiring 'standing or walking for no more than one to two hours in an eight hour work day.'"[153]

Mr. Ellis also cites a string of cases applying Judge Strawbridge's reasoning in *Campbell*.[154]  In *Ford v. Colvin*, for example, Judge Andrews remanded for an explanation as to why the ALJ found the claimant capable of performing a limited range of light work despite concluding the claimant retained the residual functional capacity to "walk/stand for two hours in an eight hour day with [a] sit/stand option."[155]  The claimant argued "the ALJ incorrectly found him to be capable of light work" because "the limitations the ALJ placed on his ability to perform light work actually resemble sedentary work."[156]  The claimant's inability to walk or stand for more than two hours, Judge Andrews said, "would conflict with Plaintiff's capability of being able to frequently lift at a light level.  Therefore, much like in *Campbell*, Plaintiff's RFC limitations seem to contradict the definition of light work."[157]

Judge Andrews found particularly problematic the ALJ's failure to explain "why Plaintiff cannot do either of the two things at the heart of light work and still be classified as being capable of performing it."[158]  Judge Andrews remanded for further proceedings, finding "there is not substantial evidence to conclude that Plaintiff's limitations equate to light work rather than sedentary, [and] the case must be remanded for further proceedings."[159]

The Commissioner distinguishes this line of authority as applied to Mr. Ellis.  The Commissioner argues Mr. Ellis fails to show the ALJ's residual functional capacity determination is outcome-determinative under the grids.[160]  The grids, the Commissioner argues, direct a finding of "not disabled" under both the "sedentary" and "light work" categories.[161]  And SSR-13, the

Commissioner is correct, directs "[i]f the individual's exertional capacity falls between two rules which direct the same conclusion, a finding of 'Disabled' or 'Not disabled,' as appropriate, will follow."[162]  This distinction is particularly apt because "sedentary"-"light work" distinction in both *Cambpell* and *Ford* directed different outcomes.  Mr. Ellis, by contrast, fails to show how he is similarly affected.

Mr. Ellis argues the Social Security Administration's Program Operations Manual System (POMS) "directs ALJs to apply the sedentary Medical-Vocational rules where a claimant is limited to even as much as four hours of stranding/walking."[163]  This claim does not compel reversal, either, as this manual "lack[s] the force of law and create[s] no judicially-enforceable rights."[164]

### G. Substantial evidence supports ALJ McCafferty's decision to afford little weight to the assessments of Jiwesh Jha, M.D and Daniel P. Coachi, M.D.

Mr. Ellis argues ALJ McCafferty erred in affording no deference to any of the medical opinions of his treating physicians.[165]  We find substantial evidence supports ALJ McCafferty's decisions to afford little weight to the medical opinions of Joseph Bucher and Dr. Coachi, and Jiwesh Jha.  ALJ McCafferty exercised proper discretion in affording those opinions little weight, as they contain internal inconsistencies or run sufficiently counter to the objective evidence in the record.

"A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"[166]  If the ALJ determines "a treating source's medical opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case

record," it is afforded "controlling weight."[167]  The Commissioner places such an evidentiary premium on the opinions of treating sources because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations."[168]

But we must be equally mindful "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."[169]  Therefore, when a treating source's "opinion is internally inconsistent, an ALJ may properly give that opinion less weight or no weight."[170]  And when a treating source's opinion is not entitled to controlling weight, "the ALJ [can] evaluate and weigh [it] against other medical evidence in the record."[171]

Applying these principals, we find substantial evidence supports ALJ McCafferty's decision to afford little weight to the opinion completed by Joseph Bucher, CRNP, and cosigned by Dr. Coachi, M.D.[172]  ALJ McCafferty assigned little weight to the opinion, finding "it is inconsistent with the objective evidence and treatment history and is internally inconsistent" because it noted Mr. Ellis "can sit for *six hours at a time* and *for two hours total* in an eight-hour workday."[173]  ALJ McCafferty also wrote the Bucher-Coachi "assessment further notes that the claimant does not need a cane," and "cannot use his left foot for foot control."[174]  Such a note was conspicuous, ALJ McCafferty wrote, because "[t]here is no support in the record for left sided lower extremity issues."[175]  Our independent review of the assessment confirms ALJ McCafferty's characterization.  There is no evidence supporting left-side extremity issues, and it is inconsistent to opine Mr. Ellis can sit for six hours at a time but only two hours total throughout the course of a workday.  It is possible, indeed likely, such a notation was a mere scrivener's error, but under

23

our deferential substantial evidence standard we cannot and do not fault ALJ McCafferty for declining to afford this opinion substantial weight.

Substantial evidence also supports ALJ McCafferty's decision to afford little weight to the mental residual functional capacity assessment completed by Jiwesh Jha, M.D.[176] In November 2015, Mr. Ellis received mental health treatment at the Wedge Medical Center, where he saw Diana Cosma, M.D., and Jiwesh Jha, M.D. Dr. Jha completed a residual functional capacity assessment in July of 2016, diagnosing Mr. Ellis with major depressive disorder and noting various difficulties Mr. Ellis would encounter in a work setting.[177] The form consists mostly of check-boxes, however, with little accompanying narrative assessment or explanation. ALJ McCafferty assigned the assessment "little weight because it appears to be primarily based on the claimant's subjective complaints."[178] ALJ McCafferty accurately describes the assessment, which Dr. Jha expressly noted "is based on discussion with Mr. Ellis about his ability to function in a work environment."[179] ALJ McCafferty noted Mr. Ellis's "mental status examinations were relatively normal, and the record does not contain medication management session notes or treatment notes from Dr. Jha."[180]

We find substantial evidence supports this conclusion, as the mental health records describe Mr. Ellis as "calm and cooperative" with "superficial eye contact," "sad affect, but able to articular clear[ly] his problems," "[n]o symptoms of psychosis and no manic symptoms elicited."[181] The notes also reflect Mr. Ellis's thought processes as "normal," thought content "[u]nremarkable," judgment and insight "[g]ood."[182] It is not our duty to reweigh the evidence; substantial evidence supports ALJ McCafferty's conclusion.

> **H.      We remand for further consideration of the assessments and notes of John J. Bowden, Jr., D.O., P.C., and state agency physician Kathleen Mullin, M.D.**

Mr. Ellis argues ALJ McCafferty's decision to afford little weight to the opinions of Dr. Bowden and Dr. Kathleen Mullin rest on insufficient evidence. We agree, and remand for further consideration of those assessments and treating notes.

Substantial evidence does not support ALJ McCafferty's decision to discount Dr. Bowden's physical residual functional capacity assessment as informed by his various treatment notes. In March 2015, Mr. Ellis transferred to Dr. Bowden's care for convenience purposes, following a referral from Dr. Coachi.[183] Dr. Bowden's residual functional capacity assessment diagnoses Mr. Ellis with lumbar spine disc herniations, right knee degenerative joint disease, and lumbar radiculopathy.[184] Dr. Bowden checked the boxes indicating Mr. Ellis could sit, stand, or walk "less than 2 hours" over the course of an eight-hour workday, would need a job permitting him to shift positions at will, and would occasionally need to take unscheduled breaks."[185] Dr. Bowden then checked the boxes indicating Mr. Ellis could "[f]requently" lift less than ten pounds, "[o]ccassionally" lift ten pounds, and (confusingly), also checked the boxes indicating Mr. Ellis could "[f]requently" lift twenty and fifty pounds.[186]

ALJ McCafferty assigned Dr. Bowden's assessment "little weight," not on the ground it is internally inconsistent, but on the ground it is "not consistent with the claimant's routine and conservative treatment history or recommendations."[187] ALJ McCafferty explained "[t]reatment notes from Dr. Bowden's office contain minimal positive objective findings and do not suggest that the claimant has been advised to pursue more aggressive treatment, which is inconsistent with the above limitations."[188] Upon close examination of the record, this conclusion does not rest on substantial evidence. On April 20, 2015, Dr. Bowden wrote Mr. Ellis's "[c]urrent medications are not holding."[189] Dr. Bowden discontinued Mr. Ellis's Oxycodone 15 mg prescription and prescribed 30 mg.[190]

Dr. Bowden referred Mr. Ellis for an MRI on his back and knee. Mr. Ellis's April 25, 2015 lumbar spine MRI revealed:

1. Disc degeneration with mild broad based disc protrusion at L1-2.
2. Disc degeneration with mild to moderate broad based disc protrusion as described at L2-3.
3. Broad disc protrusion with left greater than right neural foraminal narrowing at L4-5 with small focal midline disc herniation.
4. Mild disc bulging to the right at L5-S1.
5. No evidence of fracture/dislocation[,] marrow replacing process or intraspinal/paraspinous mass.[191]

The April 28, 2015 MRI of Mr. Ellis's right knee revealed (1) "[d]egenerative joint disease laterally," (2) "[d]egenerative signal both menisci without tear," and (3) "[f]ibrotic signal at the anterior cruciate ligament suggestive of healed prior injury."[192] Dr. Bowden saw Mr. Ellis on May 28, 2015, writing Mr. Ellis is suffering from "significant back pain," particularly on the right side, with "numbness radiating down the right lower extremities."[193] Mr. Ellis, Dr. Bowden wrote, experiences "excruciating pain when lifting or carrying anything heavier than 5-10 pounds."[194] In the "[p]hysical [e]xamination" section of the notes, Dr. Bowden reported "decreased range of motion on lateral rotation and extension," with a "positive" straight leg test on the right side.[195] Dr. Bowden also noted, in relevant part, Mr. Ellis experienced a "[s]ensory deficit in the right leg, calf, and foot area," a "[p]ositive cross-over straight leg test," a [p]ositive shopping car test," "[s]ignificant tenderness over the lumbar facet joins at L3-4, 4-5, 5-6," and a "[p]ositive Mannkopf's test with increase in pulse rate above 5% with palpation of the lumbosacral area."[196] ALJ McCaffery does not explain why these positive objective findings are "minimal."[197]

Treatment notes from summer 2015 further undermine ALJ McCafferty's decision to afford Dr. Bowden's opinion little weight. As Dr. Bowden reported on July 16, 2015, Mr. Ellis is receiving relief for only a week following the injections and his "[b]ack pain is constant in

nature."[198]  In the "[e]xamination" section of the notes, Dr. Bowden noted "[f]lexion, [e]xtension, [d]ecreased," and "[a]ll [m]ovements [e]licit [p]ain."[199]  And on July 19, 2015, Dr. Bowden wrote Mr. Ellis is receiving "little relief" from the injections with Dr. Lam.[200]  Mr. Ellis would apparently not find relief into the early fall, either, as Dr. Bowden's notes of October 17, 2015, again report "[a]ll movements elicit pain," and "[f]lexion, extension, side bending bilaterally decreased."[201]  Pain specialist Dr. Lam's notes of May 3, 2016, state Mr. Ellis has "failed to respond to conservative treatment."[202]

 Dr. Bowden's notes document a patient in consistent pain, receiving only short-term relief from medication and injections.  The objective findings in those notes lend significant credibility to Mr. Ellis's own testimony.  And yet ALJ McCafferty concluded these very notes "do not sustain the claimant's allegations of disabling symptoms and limitations."[203]  We remand this issue for further consideration of the assessment and notes of Dr. Bowden, who gained a "detailed, longitudinal picture" of Mr. Ellis's impairments.[204]

We similarly conclude substantial evidence does not support ALJ McCafferty's decision to afford little weight to the assessment completed by Kathleen Mullin, M.D., the state agency physician who assessed Mr. Ellis following referral from the Bureau of Disability Determination.  Dr. Mullin completed an examination report dated March 18, 2014.[205]  The report contains a narrative assessment followed by a check-box residual functional capacity assessment.  ALJ McCafferty assigned little weight to the assessment, finding "the mild objective findings from the consultative examination" to be inconsistent "with the limitations imposed."[206]  ALJ McCafferty found important Dr. Mullin's statements Mr. Ellis "had normal gait, normal stance, needed no help changing for examination, [and] had minimal abnormal findings on musculoskeletal examination and normal psychological findings."[207]  Despite these observations, however, Dr. Mullin

concluded Mr. Ellis could only "occasionally" lift or carry up to ten pounds, could sit and walk for only thirty minutes at a time, could only stand for twenty minutes at a time, and could not sit more than four hours per day.[208]

Dr. Mullins's assessment, much like Dr. Bowden's assessment, finds significant limitations in Mr. Ellis's ability to stand, sit, and move. ALJ McCafferty afforded little weight to the assessment, however, on the ground Dr. Mullin "relied primarily on the claimant's subjective complaints, which are not corroborated by the objective examination," and "her assessment does not reflect an independent assessment of the claimant's maximum level of functioning and is inconsistent with the record as a whole."[209] While it is true Dr. Mullin assessed Mr. Ellis on only one occasion, ALJ McCafferty did not explain just how the limitations Dr. Mullin recommended actually conflict with various tests and medical notes from other care providers showing limited mobility and severe pain.

### III. Conclusion.

In the accompanying Order, we partially grant Mr. Ellis's request for review and remand to the Commissioner for further study and decision consistent with this Memorandum.

---

[1] Administrative Record ("R. __") 124–30, ECF Doc. No. 8.

[2] R. 71.

[3] R. 79–80.

[4] R. 80.

[5] R. 81.

[6] R. 78.

[7] R 78, 82.

[8] R. 78.

[9] *Id.*

[10] R. 96.

[11] R. 82.

[12] *Id.*

[13] *Id.*

[14] *See, e.g.*, R. 79.

[15] R. 82.

[16] R. 82–83.

[17] R. 84.

[18] R. 84–85.

[19] R. 88.

[20] R. 89.

[21] R. 89, 96.

[22] R. 96.

[23] *Id.*

[24] R. 91.

[25] R. 89.

[26] R. 91

[27] *Id.*

[28] R. 91–92.

[29] R. 92

[30] *Id.*

[31] A vocational expert is "an expert who testifies in disability hearings about whether there is a substantial number of jobs in the local economy that the claimant is physically and mentally able to perform." *Bjornson v. Astrue*, 671 F.3d 640, 644 (7th Cir. 2012).

[32] R. 98–99.

[33] R. 99.

[34] R. 99–100.

[35] R. 100.

[36] *Id.*

[37] R. 101.

[38] R. 102.

[39] *Id.*

[40] R. 223–30.

[41] R. 226–28.

[42] R. 229.

[43] R. 223.

[44] R. 370.

[45] R. 372.

[46] *Id.*

[47] *Id.*

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] *Id.*

[52] R. 384–86.

[53] R. 385 (stating in a footnote "SSR 83-12 specifically states that unskilled jobs are particularly structured so that a person cannot ordinarily sit or stand at will").

[54] *Id.*

[55] R. 381.

[56] 42 U.S.C. § 423(d)(1)(A).

[57] *Kich v. Colvin*, 218 F. Supp. 3d 342, 352 (M.D. Pa. 2016).

[58] *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987) (internal quotation marks omitted).

[59] *Zirnsak v. Colvin*, 777 F.3d 607, 611 (3d Cir. 2014).

[60] *Plummer v. Apfel*, 186 F.3d 422, 428 (3d Cir. 1999).

[61] *Bowen*, 482 U.S. at 141.

[62] *Id.*

[63] *Patel v. Colvin*, 214 F. Supp. 3d 383, 385 (E.D. Pa. 2016).

[64] *Bjornson*, 671 F.3d at 645.

[65] *Rutherford v. Barnhart*, 399 F.3d 546, 551 (3d Cir. 2005).

[66] *Patel*, 214 F. Supp. 3d at 385.

[67] R. 10–24.

[68] R. 12.

[69] *Id.* ALJ McCafferty also concluded Mr. Ellis's "alleged impairment of bronchitis is a non-severe impairment[] because it causes no more than minimal limitations in the claimant's ability to perform basic work activities." R. 13.

[70] R. 13.

[71] R. 16.

[72] The Commissioner defines "light work" at 20 C.F.R. § 416.967(b):

"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when

it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

[73] R. 15.

[74] R. 16.

[75] R. 19.

[76] *Id.*

[77] R. 1–3.

[78] *Witkowski v. Colvin*, 999 F. Supp. 2d 764, 772 (M.D. Pa. 2014).

[79] *Id.* at 772–73.

[80] *Bynum v. Colvin*, 198 F. Supp. 3d 434, 436 (E.D. Pa. 2016); *Witkowski*, 999 F. Supp. 2d at 772–73.

[81] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *see Patel*, 214 F. Supp. 3d at 384.

[82] *Patel*, 214 F. Supp. 3d at 384.

[83] *Bynum*, 198 F. Supp. 3d at 436.

[84] *Id.* at 436–37.

[85] R. at 22.

[86] R. at 23.

[87] *Boone v. Barnhart*, 353 F.3d 203, 205–06 (3d Cir. 2003), *as amended* (Dec. 18, 2003).

[88] *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984); *see Zirnsak*, 777 F.3d at 614.

[89] *Boone*, 353 F.3d at 206.

[90] *McHerrin v. Astrue*, No. 09-2035, 2010 WL 3516433, at *3 (E.D. Pa. Aug. 31, 2010).

[91] *Id.*

[92] *Id.*

[93] *Alvarado v. Colvin*, 147 F. Supp. 3d 297, 306 (E.D. Pa. 2015) (quoting *Dictionary of Occupational Titles*, Appendix C).

[94] *Id.* (quoting *Dictionary of Occupational Titles*, Appendix C).

[95] R. 99 (emphasis added).

[96] *Alvarado*, 147 F. Supp. 3d at 306 (quoting *Dictionary of Occupational Titles*, Appendix C).

[97] R. 101.

[98] *Id.*

[99] *Money v. Barnhart*, 91 F. App'x 210, 214 (3d Cir. 2004).

[100] *Id.* at 215.

[101] *Id.* (emphasis added) (citation and internal quotation marks and alterations omitted).

[102] 147 F. Supp. 3d 297 (E.D. Pa. 2015).

[103] *Alvarado*, 147 F. Supp. 3d at 307.

[104] *Id.*

[105] *Id.*

[106] R. 99 (emphasis added).

[107] *Alvarado*, 147 F. Supp. 3d at 306 (quoting *Dictionary of Occupational Titles*, Appendix C).

[108] The Commissioner argues substantial evidence nonetheless supports the ALJ's decision because Mr. Ellis can carry out level two jobs based on his education and previous work experience. *See* ECF Doc. No. 12 at 14–17. The Commissioner's reliance on *Zirnsak v. Colvin*, 777 F.3d 607 (3d Cir. 2014) does not compel such a result here. Mr. Ellis's education is not the sole factor bearing on such an analysis; in the time since obtaining his GED and his past relevant work he testified to an inability to focus and struggling with self care. *Compare* R. 86, 88, 96; *with Upshur v. Colvin*, 200 F. Supp. 3d 503, 513 (E.D. Pa. 2016). Like in *Upshur*, counsel attempted to explore this inconsistency at the hearing. We think it appropriate for the ALJ to resolve these evidentiary arguments on remand.

[109] ECF Doc. No. 11 at 16–18.

[110] ECF Doc. No. 12 at 8–14.

[111] R. 381.

[112] *Townley v. Heckler*, 748 F.2d 109, 114 (2d Cir. 1984).

[113] *Id.* at 111.

[114] *Id.*

[115] *Id.* at 112.

[116] *Id.* at 114.

[117] *Id.*

[118] *Id.*

[119] *Welsh v. Comm'r Soc. Sec.*, 662 F. App'x 105, 109 (3d Cir. 2016) (quoting *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002)).

[120] *Id.*

[121] *Id.*

[122] *Haase v. Colvin,* No. 16-1480, 2018 WL 5973766, at *1 (M.D. Pa. Nov. 14, 2018).

[123] ECF Doc. No. 11, at 21.

[124] *Bowen*, 482 U.S. at 141.

[125] *Dismuke v. Comm'r of Soc. Sec.*, 309 F. App'x 613, 616 (3d Cir. 2009) (citing 20 C.F.R. § 404.1526(a)).

[126] *Id.* (quoting 20 C.F.R. § 404.1526(a)).

[127] ECF Doc. No. 11, at 21.

[128] R. 13.

[129] *Id.*

[130] *Id.*

[131] *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004).

[132] *Ames v. Astrue*, No. 11-1775, 2013 WL 435451, at *16 (M.D. Pa. Feb. 4, 2013).

[133] R. 13.

[134] ECF Doc. No. 11 at 18–20.

[135] *Burns v. Barnhart*, 312 F.3d 113, 128–29 (3d Cir. 2002).

[136] *Id.* at 129 (citing 20 C.F.R. § 416.967 (2002)).

[137] 20 C.F.R. § 416.967(a).

[138] *Id.*

[139] *Id.* (emphasis added).

[140] SSR 83-10, 1983 WL 31251, at *5.

[141] 20 C.F.R. § 416.967(b).

[142] *Id.* (emphasis added).

[143] SSR 83-10, 1983 WL 31251, at *6.

[144] *Id.*

[145] *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000).

[146] *Castellano v. Berryhill*, No. 17-1035, 2018 WL 4441800, at *9 (M.D. Pa. Aug. 24, 2018), *report and recommendation adopted*, No. 17-1035, 2018 WL 4404654 (M.D. Pa. Sept. 17, 2018).

[147] *Id.*

[148] *Campbell v. Astrue*, No. 09-5356, 2010 WL 4689521, at *1 (E.D. Pa. Nov. 2, 2010).

[149] *Id.* at *3.

[150] *Id.* at *5.

[151] *Id.*

[152] *Id.*

[153] *Id.*

[154] *See* ECF Doc. No. 11 at 18–20 (citing *Bisceglia v. Colvin*, 173 F. Supp. 3d 326 (E.D. Va. 2016); *Ford v. Colvin*, No. 14-01046, 2015 WL 4608136 (D. Del. July 31, 2015); *Ferdin v. Colvin*, No. 15-29, 2015 WL 7767980 (W.D. Tex. July 30, 2015); *Riley v. Colvin*, No. 13-1223, 2014 WL 4796602 (M.D. Pa. Sept. 26, 2014)).

[155] *Ford*, 2015 WL 4608136, at *3.

[156] *Id.* at *7.

[157] *Id.* at *8.

[158] *Id.*

[159] *Id.*

[160] ECF Doc. No. 12, at 4.

[161] *Id.*

[162] SSR 83-10, 1983 WL 31251, at *6.

[163] ECF Doc. No. 11 at 19.

[164] *Bordes v. Comm'r of Soc. Sec.*, 235 F. App'x 853, 859 (3d Cir. 2007).

[165] ECF Doc. No. 11 at 22–29.

[166] *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).

[167] 20 C.F.R. § 404.1527(c)(2).

[168] *Id.*

[169] *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 361 (3d Cir. 2011).

[170] *Debias v. Astrue*, No. 11-3545, 2012 WL 2120451, at *9 (E.D. Pa. June 12, 2012).

[171] *Money v. Barnhart*, 91 F. App'x 210, 213 (3d Cir. 2004).

[172] *See* R. 20 (ALJ McCafferty's reasoning); R. 442–47 ("Medical Source Statement of Ability to Do Work-Related Activities (Physical)" signed by Joseph Bucher, CRNP, and Dr. Coachi).

[173] R. 20 (emphasis added).

[174] *Id.*

[175] *Id.*

[176] R. 21 (ALJ McCafferty's reasoning); R. 1007–12 ("Medical Assessment of Ability to Do Work-Related Activities (Mental)" completed by Jiwesh Jha).

[177] R. 1008.

[178] R. 21.

[179] R. 1008.

[180] R. 21.

[181] R. 665.

[182] R. 667.

[183] R. 500.

[184] R. 825.

[185] *Id.*

[186] R. 826.

[187] R. 20.

[188] *Id.*

[189] R. 533.

[190] *Id.*

[191] R. 514.

[192] R. 512.

[193] R. 552.

[194] *Id.*

[195] *Id.* "The straight leg raise test is done to determine whether a patient with low back pain has an underlying herniated disc. The patient, either lying or sitting with the knee straight, has his or

her leg lifted. The test is positive if pain is produced between 30 and 70 degrees." *Ames*, 2013 WL 435451, at *12.

[196] R. 552.

[197] R. 20.

[198] R. 529.

[199] *Id.*

[200] R. 496.

[201] R. 523.

[202] R. 772.

[203] R. 21.

[204] 20 C.F.R. § 404.1527(c)(2).

[205] R. 463.

[206] R. 20.

[207] R. 20–21.

[208] R. 467–68.

[209] R. 21.